TUCKER, Judge.
I shall consider this case precisely in the same light as if David Bradley, on the third day of September, 1792, had executed a voluntary deed, without any valuable consideration, or even a good one in law, to support it, to any third person whatsoever; and that the same had been recorded, as in the present case, -and that possession of the slaves had accompanied this voluntary donation. And, after a possession of twelve years, the defendants, without any previous notice or warning to the donee to defend his right, had levied their execution upon these slaves.
On behalf of the defendants, it is alleged, that a voluntary gift of these slaves, made at the time of the deed of emancipation, would be void as to them, they being at that time the creditors of David Bradley: and even if they were not creditors at that time, if he were indebted to any other person, it would run on so as to take in all subsequent creditors. To which there may be two answers given.
1. That the only evidence that David Bradley was, or could be made liable as a debtor to these defendants, is the judgment of the Suffolk district court, entered by confession, and therefore must be taken to have been by the mutual assent and agreement of the parties to it. That judgment is for three distinct sums, viz. for £416. 5. with interest from the 1st of March, 1791; for ^83. 17. 6. with interest from the 15th of May, 1798; and for £46. 4. with interest from November 1797. The first of these sums, therefore, must be presumed to be the amount of a debt liquidated on the 1st of March, 1791, and fixes the devastavit, to that amount, to that period. Consequently, being two months antecedent to the marriage of David Bradley, with the executrix. If the marriage had not taken effect, or if David Bradley had not survived his wife, having no ^estate derived from her, he could never have been made liable for this debt. And, although he was certainly liable to be burthened with it inasmuch as he might also escape from that burthen by an event equally possible, I do not consider him as the debtor of the defendants Woodley and wife, until the confession of judgment in the Suffolk district court on the 24th of May, 1804: which being many years subsequent to the deed, can have no operation upon it. And, for the same reason, the other debts entered by confession, and appearing to be many years posterior to the deed, can have no operation upon it.
The circumstances of this case appear to me to be very distinguishable from those of the East India Company against Clausel, cited 3 Bac. Ab. 315; 2 Eq. Cas. Ab. 52, 481, where Clausel agreed with the company to go as president to Bengal, and entered into a bond of ^2000 penalty for performance of articles; but before he set out, made a settlement of his estate; and, among other things, a portion for his daughter, who afterwards married one, who was advised by his counsel that the portion was sufficiently secured: and, Clausel having embezzled the goods and stock of the company, the question was, whether this settlement was voluntary and fraudulent as to them? and it was holden to be a prudent *976 and honest provision without anj colour of fraud: and, although, in its creation, it was voluntary, yet being the motive and inducement to the marriage, it is made valuable. But had it been decided otherwise, it must be remembered, that the fraud of Clausel, in embezzling the company’s goods, had relation to his own contract, and express undertaking; that, after he had been guilty of it, he could, by no possibility, be discharged from the penalty attached to it; nor could his executors or administrators, nor even his heirs, if bound by the obligation. But here, David Bradley, was no party to the first devasta-vit; and if he had survived his wife without a judgment against him in her lifetime, he never could have been made liable for it afterwards, except as her administrator, if he had taken administration upon her estate.
*2. Were it true, that a man, worth ¿£10,000, being indebted ¿£100, or ¿£1000, would be guilty of actual fraud upon his creditors, by giving away a negro of the value of ¿£100, which fraud should attach itself to that gift twelve years afterwards, in case he should at that time have wasted the residue of his estate; yet there is an express authority in 1 Atk. 93, 94, that under the statute of the 13th of Elizabeth, from which our statute of frauds and perjuries is, in part, taken, it is necessary to prove that the party making the deed, was indebted at the time'; or immediately after the execution of the deed; which proof is not offered in the present case, nor is the fact suggested. 5 Ves. jr., 387.
3. But it appears to me, that under the true construction of our several acts of assembly, 1757, ch. 3; 1758, ch. 1; 1787, ch. 22, wherever the possession has been delivered, and the donees have remained in possession; or when the deed has been duly proved and recorded, fraud shall never be presumed, but must be absolutely charged and proved, in order to set aside such a gift, either in favour of creditors, or purchasers.
4. That in every such case as that last mentioned, five years undisturbed possession in the donee, may be pleaded in bar of any claim, either in law or equity, unless the plaintiff’s claim be saved under some of the exceptions in the act of limitations.
5. That, even within the five years, due solemnities being observed, and possession given under a voluntary deed, the donee cannot be divested of his property in the slave by any judgment or decree, in any suit in which he is not a party. The case of Burnley v. Lambert, 1 Wash. 308, in which it was decided, in this court, that after the assent of an executor to a legacy of a slave, the slave is not liable to be taken .in execution upon a judgment against the executor, as executor, is, I apprehend, a stronger case, than that which I have supposed.
But it will be objected, that slaves emancipated, are, by express provision in our law, liable to be taken in execution, *to satisfy the debts of the emancipator, contracted before the deed or will emancipating them shall take effect.
To which I answer, so are the slaves of every person dying indebted, while they remain in the hands of the executor; but, if he assents to the legacy of a slave, the slave is no longer liable, as I have just shewn.
Reasoning, by analogy, in all these cases, I think that an emancipated slave ought not to be put in a worse situation that the voluntary donee, or legatee, of a slave, who has obtained possession by the act and consent of the donor, or by the assent of the executor: The assent of the executor being equally necessary where the slave is emancipated by will, as where he is bequeathed to another.
The existence of this very suit corroborates the opinion I have conceived, that a person de facto free, either by birth, as in the case of the children, or by actual emancipation in due form of law, as in the case of our parents, cannot be taken in execu-r tion to satisfy any judgment, or decree in any suit to which he is not a party. And this opinion, I conceive, accords with the act of 1794, ch. 15.
I am therefore of opinion that the decree be affirmed.
ROANE, Judge.
In considering this case, I cannot, for a moment, forget, (whatever my sentiments may be on the abstract questions discussed before us,) that slaves are a species of property recognized and guaranteed by our laws. The most that this court can do, in the case, is, to extend to the appellees all the consideration and favour which is compatible with the rights of property.
Considering slaves as a species of personal .property, we are remitted to the doctrines of the common law, and the constructions of the statutes against fraudulent conveyances, for the just decision of the case before us. We have, besides, one or two acts of assembly on the subject of emancipation, which it will be necessary first to consider.
At the time of the passage of the act of 1782, ch. 21, the owners of slaves, although entirely free from debt, were not *permitted to emancipate them, except in a particular mode, and for meritorious services. It was deemed even as between master and servant, and in relation to the safety and policy of the state, improper that this should be done. A degree of liberality, however, began to manifest itself at this epoch, in favour of human rights, and the former policy of the country was relaxed, and departed from. An application was made to the legislature, as appears by the preamble to the act of 1782, “that those persons who were disposed to emancipate their slaves might be empowered to do so:’’ - And this was judged “expedient under certain restrictions.” The act goes on to authorize “any person to emancipate and set free his or her slaves, who shall thereupon be fully and entirely discharged, &c. and enjoy as full freedom as if they had been particularly named in the act.”
The mischief complained of was, that conscientious persons were not permitted, even as between master and servant, to emancipate their slaves, and the act is to *977 be taken as only commensurate with this evil, The boon requested of the legislature was to change her policy, but not to infringe rights existing in and over this species of property in favour of just and bona fide creditors. Riven carried to the extent I contend for, that boon was not easily and readily' obtained; but it is certain, that the extension of the request to the point now in question, would have endangered and rendered abortive the request altogether. On general principles, the requisitions of parties, and the acts of legislatures, shall be so construed as to respect justice and vested rights; a,nd, in the case before ns, the words and language of the proviso of the act, are supposed to favour that idea. We are, therefore, saved the necessity, in this instance, of enquiring how far the legislature has power to affect the one, or the other. It is further to be remarked, that the system of our laws in relation to fraudulent conveyances is a general one, and founded on principles of justice and fair dealing. We shall not, therefore, impute, without necessity, to a particular and equivocal act, a departure from the spirit *of that system. The truth is, that the rights of creditors, or persons other than those manumitting, and those claiming under them, neither were, nor ought to have been in the contemplation of the legislature who passed that act.
If this be the true construction of the act, no argument can be drawn from the omission in it to insert a clause saving the rights of other persons, nor from such insertion in the act of 1792. In the first law, such clause was superfluous and unnecessary, and in the latter, thrown in, perhaps, through abundant caution. We have certain great principles to guide us, which make that omission or insertion wholly immaterial.
So much for the saving in the act of 1792: Now a word or two upon the proviso.
The act of 1792, after re-enacting the provision from the act of 1782, adds a proviso. declaring the liability of emancipated slaves to be taken in execution for any debt contracted by the person emancipating, before such emancipation. This provision, like the saving before mentioned, was superfluous, if my construction be right; but we are remitted by it to the general doctrine before mentioned, to ascertain what is such a debt to which the slaves so emancipated are liable.
Debts are of several kinds, and they have all, perhaps, passed in review in considering this subject of fraudulent conveyances.
In the case of Lewknerv. Freeman, 1 Eq. Cas. Abr. 149, it seemed held, that debts founded in maleficio (as arising from criminal conversation, &c.) would take place of mere voluntary conveyances, though not of real creditors; and this, although, in that case, the action was still pending which was to ascertain whether a debt of that kind actually existed or not. No jury had decreed damages at the time of the conveyance in that case; no debt had been actually ascertained.
The case of debts arising from breach of contract (especially if secured by a bond to ensure performance) would '“'stand in a higher grade, perhaps, than one of the description just mentioned. There is one character, however, common to the two; and that is, that the verdict of the jury and the judgment of the court do not so much give a new right, as ascertain an old one: They do not give, but define the right. 2 Black. Com. 438.
According to this idea, it is enough to avoid the effect of a voluntary conveyance, if the injury or foundation of the right precedes such conveyance. It is enough that the party making the conveyance is indebted, although the precise extent of that debt is not already fixed and ascertained. On this ground only, are we to understand the decision in the aforementioned case of Bewkrier v. í'rccman; and another now to be mentioned, which has a more particular analogy to the case before us.
In the case of the East India Company v. Stavely, Prec. Ch. 377, A. being appointed governour to Bengal, entered into articles and a bond for the faithful performance of his duty. A few days after, he made a voluntary conveyance in favour of his daughter. A. having afterwards embezzled property to a great amount, it became a question .between the husband of the daughter and the East India Company, whether that conveyance should riot yield to their claim for damages. It was decided in favour of the husband, but only on this ground, that it was a prudent and honest provision for the daughter; and that it induced the husband to marry her, and thereby, as it were, lost its character of a voluntary conveyance; and that he had laid out a sum of money, for the burial of the daughter, his wife. On these grounds only was that conveyance, so fortified by subsequent circumstances, adjudged to prevail: No objection whatever was taken, on the ground that the subsequent embezzlement by the father (or if you must have it so) the debt did not exist till after the conveyance in question.
These cases go to prove, that, although the particular act of devastation in this case might not have taken place, until after the emancipation, yet that the wife having given bond * (similar to the bond in the case just stated) to administer the estate according to law, that bond, the foundation of the right, would hold the property liable in the event which has happened; an event which has relation to the date of the bond, and’has called it into action: And, as the husband has succeeded to his wife’s liability, and become as it were an obligor in her stead, it is also immaterial, whether the wasting of the estate (the ground of the judgment in the Suffolk district court) was in her time, or in his. The case put by the judge who preceded me, shewing that the husband might, in event, be absolved from his liability, don’t vary this case, because, here, both the foundation and completion of the plaintiff’s right took place during his life, which is, even yet, continuing.
The truth is, that, in case of voluntary conveyances, the only enquiry is, Whether the party were indebted or not at the time? *978 And, with respect to the nature of the debt, the foregoing cases will give us some light, and fully comprehend the case before us.
We are now in a court of equity, but the same construction must be made on the statute of frauds as in a court of law. This is held in the case of Russel v. Hammond, 1 Atk. IS; and it is there further said, that although a settlement being voluntary, is not for that reason fraudulent, but is only evidence of fraud, yet by lord Hardwicke, I have hardly known an instance, where the person was indebted at the time, that the conveyance was not deemed fraudulent.
My opinion therefore is, that this voluntary conveyance, or emancipation (for I hold that they stand on the same bottom) must yield to the claim of the appellants: But I am not entirely satisfied under the conflicting testimony which exists in the cause, whether D. B. was sole owner of the slaves in question, or only one fifth owner. On the ground on which the chancellor proceeded, this enquiry was unnecessary; but, according to my opinion, it is now necessary to be settled, by an issue or otherwise. If also D. Bradley had any other property, or any other emancipated ^slaves, such property and such slaves should be applied in exoneration and aid of the appellees by such rule and proportions as are equitable and just.
My viewing this case by analogy to the ordinary case of voluntary and fraudulent conveyances, affords a ready answer to the objections arising from length of time; which, in cases of that sort, is never permitted to avail on account of the fraud inherent in the transaction.
As to parties, it is presumed that all necessary parties were convented in the two suits in the court of chancery, and the Suffolk district court; but, keeping up the analogy aforesaid, it would be necessary, before a conveyance is set aside, as voluntary and fraudulent, that the grantee should be made a party; and, in general cases, a party defendant. An obstacle arises in this case, however, to the appellees being made defendants from their incapacity to bear evidence under our laws affecting the interest of the appellants; and, as their oath could not be received, they stand in as good a situation in this suit in which they are plaintiffs, as in any other. In this suit they might not only take the ground which they have taken, but any other ground tending to their advantage. Such for example as that there was a collusion between the other parties to their prejudice, or that there was other property of £>. B. or other persons, who should contribute to their relief. These grounds they have not stated, and we cannot make their case better than they have done: But as this case is, perhaps, new, and involves human liberty, I should still incline to keep the case open, as to these subjects, if they desire it, in the court of chancery. The judge of that court, sanguine on the ground which he took, did not, perhaps, sufficiently attend to these matters.
My opinion therefore is, that the decree is erroneous, an d should be reversed, and the cause remitted to the court of chancery, to be proceeded in according to the principles of the decree, which has been agreed on in conference.
*FLJ3MING, Judge.
It is clear that the rights of creditors, as well as of other persons, were intended to be saved by the proviso in the act of 1782, authorizing the manumission of slaves. Any other construction would operate injustice to those who had trusted the owner upon the faith of that property; and ought not to be made, if the words were even doubtful: But they are not; for the act expressly saves to all persons other than the owner and those claiming under him, all such right and title as they or any of them could or might claim if this act had never been made. And if the act had never been made, it is perfectly clear, that the owner could not have made a voluntary gift of his slaves to the prejudice of his creditors.
The executrix of Harrison sold the personal estate, and soon after married Bradley; who thereby became liable for the devastavit; whether it was committed before or after his intermarriage, as both of them are living. The claims of the appellants were therefore due from him; and he could not disappoint them by a voluntary manumission of his slaves.
The administration bond makes no difference; for there is no reason why the bur-then should be shifted from the slaves, and thrown upon the innocent securities.
The act of limitations has nothing to do with the question. Por the emancipation of the slaves was a fraud upon the creditors ; and the appellees cannot derive any benefit from it as against them.
But I am not satisfied that all the appel-lees belonged to Bradley at the time of .executing the deeds of manumission; and, therefore, not only ought that fact to be enquired into, but also whether he has not other property belonging to himself, or to the testator, sufficient to satisfy the demands of the appellants; for, if so, the same ought to be previous^' applied towards the exoneration of the appellants.
CARRINGTON, Judge.
The appellees were emancipated, under the act of 1782, prior to the passage of that of 1792; *and the question is, Whether they can now be reclaimed, and sold by virtue of the execution?
The saving in the act of 1782 only extended to vested rights in the property itself; and not to a case like this, where no specific right in the slaves had been acquired. If the latter had been intended by the legislature, it would have been expressed ; but not only is that not done, bitt the very idea is repudiated by the act of 1792, providing for it, as an omitted case.
At the time of the manumission, no maladministration had been established; nor was anj' fixed until many years afterwards. And it does not appear, that there was not other estate sufficient to satisfy the claims of the appellants, if they had pursued them in time. They, however, thought proper to sleep upon their rights; and having suffered the testator’s assets to be wasted, and Bradley’s affairs to moulder away, they come, with a very ill grace, to challenge *979 the emancipation at the distance of twelve years after it was made: A period which greatly exceeds the time allowed by the statute of limitations for the pursuit of personal rights. This delay was unreasonable, and ought not to be countenanced in a court of equity, where negligence is never favoured; and much less in a case of this description. I am therefore for affirming the decree.